post office by those in charge of his business house, it would be sufficient.

3. The notice of protest deposited by the notary in the post office accurately and fully described the note by stating the date, amount, parties, when due, demand, &c., and was partly printed and partly written, and signed by the notary public in his official capacity, but his signature was printed. The district court charged that the notice, though actually received in time, was insufficient, and that the written signature of the notary and his seal of office were requisite to convey legal notice to the indorser. This we hold to be erroneous, and are of opinion that such a notice as above described, if actually received in time, would fix the indorser's liability.

It only remains to add that the instruction asked by the plaintiff as to the custom of the bank, was not, for aught that now appears, improperly modified. Reversed and remanded.

---

SPALDING (LEGIONARY PAYMASTER v.). See Case No. 8,212.

SPALDING (LEWIS v.). See Case No. 8,-334.

SPALDING (MEWSTER v.). See Case No. 9,513.

SPALDING (UNITED STATES v.). See Cases Nos. 16,364 and 16,365.

---

## Case No. 13,202.

### SPANISH CONSUL'S PETITION.

[1 Ben. 225.] [1]

District Court, S. D. New York. June, 1867.

WITNESS— FOREIGN COMMISSION—POWER OF THE COURT TO SUMMON.

1. Where a commission was issued by a judge in Cuba to the Spanish consul in New York to take testimony to be used in a criminal prosecution for swindling, and the consul thereupon applied to the district court for a summons to compel the witness to appear and testify: *Held*, that the only provisions made by congress on the subject of enforcing the giving of testimony in judicial proceedings pending in a foreign country, are found in the acts of March 2, 1855 (10 Stat. 630), and of March 3, 1863 (12 Stat. 769).

2. Neither of those acts applied to this case, and the court had no power to issue the summons asked for.

Coudert Bros., for petitioner.

BLATCHFORD, District Judge. The petitioner, who is the consul of her majesty the Queen of Spain at the port of New York, represents that he has received from the judge of the Southern district of Santiago, in the island of Cuba, a commission, empowering him to take the testimony of certain witnesses named therein, to be used in a criminal prosecution for swindling, a trans-

lation of which commission he produces, and he prays that a summons may be issued by me requiring the witnesses to attend and testify. I have no power to issue the summons asked for. The only provisions made by congress, on the subject of enforcing the giving of testimony in judicial proceedings pending in a foreign country, are those found in the act of March 2, 1855 (10 Stat. 630, § 2), and in the act of March 3, 1863 (12 Stat. 769). The former provides that "where letters rogatory shall have been addressed from any court of a foreign country to any circuit court of the United States, and a United States commissioner designated by said circuit court to make the examination of witnesses in said letters mentioned, said commissioner shall be empowered to compel the witnesses to appear and depose in the same manner as to appear and testify in court." The latter act is confined to the taking of testimony to be used in a suit for the recovery of money or property depending in a court of a country with which the United States are at peace, and in which the government of such foreign country is a party or has an interest. The prayer of the petition is denied.

---

SPANN (GAINES v.). See Case No. 5,178.

SPARHAWK (CLARK v.). See Case No. 2,-836.

---

## Case No. 13,203.

### SPARHAWK et al. v. COCHRAN.

[30 Leg. Int. 233; [1] 5 Leg. Op. 101.]

Circuit Court, E. D. Pennsylvania. May 3, 1873.

USURY—PURCHASE OF NOTE—AGENTS.

Plaintiff drew his promissory note to his own order, endorsed in blank, and placed it with collaterals with certain brokers for negotiation or sale, defendant bought the note from the brokers in the regular course of business, without actual knowledge that they were plaintiff's brokers, at a greater rate than six per cent.: *Held*, that the transaction was not usurious within the meaning of the Act of 1858.

[Error to the district court of the United States for the Eastern district of Pennsylvania.]

This case was tried on December 2, 1872, in the United States district court for the Eastern district of Pennsylvania. The district judge being related to defendant's wife, by agreement of counsel, Samuel Dickson, Esq., sat as assessor. The facts of the case appear in his opinion given below. A nonsuit was entered against plaintiffs and on December 30th, 1872, the motion to take the non-suit off was refused, and the following opinion was delivered by Mr. Dickson:

The facts of the case were as follows: On the 13th of October, 1871, the bankrupt drew his promissory note to his own order, and

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

[1] [Reprinted from 30 Leg. Int. 233, by permission.]

having endorsed the same in blank, placed it, together with $28,000 City 6's as collateral, with Messrs. C. & H. Borie for negotiation or sale. On the same day the Messrs. Borie, who were bankers and brokers, rendered an account as for the sale of the note, and gave their check for the net proceeds less the discount, commissions and other charges. The defendant, William G. Cochran, bought the note from the Messrs. Borie, in the regular course of business, and without any actual knowledge that they were acting as the brokers of Mr. Yerkes, at a greater rate of discount than six per cent., and repaid himself at the maturity of the note by a sale of the collateral. The excess over six per cent. allowed in the purchase of the note was $391.-66, and for that amount, with interest from February 1, 1872, the plaintiffs are entitled to judgment, in case the transaction be usurious within the meaning of the act of assembly of 28th May, 1858.

For the plaintiff [John Sparhawk] it was argued that as the Messrs. Borie were the undisputed agents of Mr. Yerkes, and the note was drawn solely for the purpose of obtaining a loan of money, the transaction was in effect a loan by the defendant to the bankrupt at a greater discount than six per cent., and as their business was in part that of note brokers, the defendant was either affected with notice of their agency or at least chargeable with negligence in not having made inquiry. The note, not having had any bona fide existence as a note till after it left their hands, was still the note of the bankrupt when sold to the defendant, and it only acquired validity to the extent to which value was actually paid for it. And this is so regardless of the actual knowledge of the defendant, as the law against usury is based on public policy, and operates without regard to the intention of the parties; while the manner in which the note was drawn might also, perhaps, put the buyer on inquiry. Should it not be so held, the laws against usury may be so easily evaded as to become inoperative. In support of these views reliance was had upon the cases decided in New York, Massachusetts and Maryland, and specially upon Conrad's Case [Case No. 3,-126], and without conceding that the Pennsylvania cases established a different rule, it was urged that in the United States courts they were not binding authority.

For the defendant it was contended that the case fell within the proviso to the second section of the act of 28th May, 1858, which is in these words: "Provided always, that nothing in this act shall affect the holders of negotiable paper taken bona fide in the usual course of business." And that if such operations should be held usurious, it would be impossible to transact the business of the community.

As to any argument drawn from considerations of public policy, it is conceived that little help can be gained. On the one hand it may be said, in the language of Mr. Justice Williams, in Howkins v. Bennett, 97 E. C. L. 506, 553: "Parties are entitled to evade the law,—a man is guilty of no offence, who so conducts his affairs as not to infringe an act of parliament. I see no objection to an evasion of the law in that sense." And on the other hand, if the reasonable construction of the law shall give rise to inconvenience, that is a matter for the legislature. It is clear that in a certain sense a note is not a note till delivery, for, as was said in Conrad's Case [supra], by McKennan, J.: "These notes were drawn, dated, signed and endorsed at Philadelphia, where the drawers and endorsers resided. But had they any efficacy there? Did they there impose any obligation upon these parties to pay the sum stated on their face? Were they there evidence of indebtedness to any one? Clearly not, because, until they had passed out of the hands of the persons who made them, they belonged to them, and did not bind them to pay anything to anybody, and would not sustain any action upon them. They were not contracts because there was only one party to them. Something else was essential to impress upon them the character and qualities of a contract —that was their transfer to some one else for a valuable consideration. They then became, for the first time, promises to pay. Before they had no legal existence: by that fact they were brought into life, and invested them with the obligation and validity of promissory notes." So in the present case, if the question is to be decided without reference to the rights of the defendant as a bona fide purchaser without notice, of a negotiable security, the brokers would be regarded as simply the agents of an undisclosed principal, and the transaction in effect would be the same as if the bankrupt had taken his own note to the defendant for sale, and made the negotiation with him in person. Erie Bank v. Smith, 3 Brewst. 9. It was still the bankrupt's own note at the time it was bought, and had no efficacy or vitality until after it had been taken by the defendant. Hence, in other states, the rule is generally well settled, that if a note made for the purpose of raising money is discounted at a higher premium than the legal rate of interest, and none of the parties whose names are on it can, as between themselves, maintain a suit on the note, when it becomes mature, provided it had not been discounted, then such discounting of the note is usurious, for it is then that it first exists as a contract. Knights v. Putnam, 3 Pick. 184; Munn v. Commission Co., 15 Johns. 55; Powell v. Waters, 17 Johns. 176. Mr. Justice Sharswood, however, in his notes to Byles on Bills, p. 377 (245*), after citing the cases on this point, adds, "It is otherwise, however, if the purchaser is ignorant of the character of note"—referring to Whitworth v. Adams, 5 Rand. (Va.) 333; Ramsey v. Clark, 4 Humph. 244; Creed v. Stevens, 4 Whart. 223; Long

v. Gantley, 4 Dev. & B. 313; Hays v. Walker, 7 Blackf. 540; May v. Campbell, 7 Humph. 450.

In Pennsylvania the decisions have generally followed this latter view. The language of the act of March 2, 1723 (1 Smith's Laws, 156), was: "That no person shall directly or indirectly, for any bonds or contracts to be made after the publication of this act, take for the loan or use of money," etc. In Craig v. Pleiss, 2 Casey [26 Pa. St.] 271, decided in 1856, Woodward, J., says: "The offence consists not in bargaining for more than six per cent., but in taking it on any bond or contract, and the idea of a corrupt contract as indispensable to the offence of usury, is derived from the English statutes, which were never in force here, and the imagined necessity of a corrupt bargain to complete the offence of usury, favored as it no doubt has been by loose expressions of judges, is wholly without foundation in our statute." Even under that act, however, it was resolved in Musgrove v. Gibbs, 1 Dall. [1 U. S.] 236, that a fair purchase might be made of a bond or note, even at twenty or thirty per cent. discount without incurring the dangers of usury, and it was left to the jury "to determine whether on certain facts the defendant had loaned the money or purchased the note in question." What the certain facts were do not clearly appear, but it would seem that Richardson, through the mediation of Shoemaker, borrowed the money from the defendant and gave his note for it. Whether that note was to the order of Shoemaker is not stated, but the note given in renewal thereof was so drawn. It is clear, however, that this second note was no note in the eye of the law, so long as it was in the hands of Shoemaker, who was the mere agent to negotiate the loan, and yet it was left to the jury to say, whether the transaction was not a bona fide sale by him to the defendant. In Wycoff v. Loughead, 2 Dall. [2 U. S.] 92, the third resolution is, that "a man may bona fide purchase any security for the payment of money, at the lowest rate he can without incurring the penalties of usury." This may mean that the bona fide holder or owner may so sell it, and is therefore of no assistance in this inquiry. In Griffith v. Reford, 1 Rawle, 196, it was held, under the rule in Walton v. Shelley [1 Term R. 300], that the maker of a note was incompetent to prove that the defendant was an accommodation endorser, and that the consideration of the note was usurious. Huston, J., dissented, and put his opinion on the ground that the evidence showed that the transaction was, in fact, a loan, and not a bona fide purchase of negotiable paper—conceding that if it had been a purchase, the plaintiff was entitled to recover. Creed v. Stevens, 4 Whart. 223, was an action by the holder of a note, endorsed in blank, against the payee and endorser, who set up in his affidavit of defence that he was only an accommodation en-

dorser, and that "the transaction between the parties really interested in the note was usurious." Sergeant, J., in his opinion, says: "The affidavit states that the transaction between the parties really interested was usurious, but it does not state that the plaintiff was one of these parties, and he certainly may not have been, because a note endorsed in blank passes by delivery, and he may have received it from one who obtained it from the original parties." And the judgment below for the plaintiff was affirmed. In Gaul v. Willis, 2 Casey [26 Pa. St.] 259, decided in 1856, it was held that the holder of a negotiable note, who purchased it at a greater discount than six per cent. may recover from the accommodation maker, though the payee endorsed and sold it, to a person from whom the holder bought it, at a greater discount than six per cent., Lewis, C. J., said: "Neither Drexel & Co." (who bought the note from the payee, in whose hands it was as yet no note), "nor Willis" (their vendee). "had any knowledge of the purpose for which the note was given. They had a right to put faith in the representation on the face of the paper, that it was given for a valuable consideration. As against the parties who made that representation, the note must be held to be as they represented it. * * * Willis neither loaned or intended to loan any money to Rudman (the payee), or to Gaul (the maker), his dealings were with Drexel & Co. There was no intention on the part of the latter to borrow, and no engagement to return the money received, or any part of it, or to pay any sum whatever for the use of it. Nor was there any intention on the part of Willis to lend money to them. It was a clear purchase of the security, and nothing else. Had he a right to purchase it at a greater discount than six per cent.? That he had was fully settled so long ago as 1785. Wycoff v. Loughead, 2 Dall. [2 U. S.] 92; Musgrove v. Gibbs, 1 Dall. [1 U. S.] 236." This case was followed by that of Moore v. Baird, 6 Casey [30 Pa. St.] 138, (Jan. term, 1858), in which the endorsee of an accommodation note, who had bought it from the payee at a greater discount, was allowed to recover the full amount of the note from the maker. So that if the bankrupt had gone through the form of having the note drawn by his clerk or office boy to his own order, he could himself have gone directly to the defendant and made the negotiation in person. In such a transaction, the payee who made the sale, was really the principal, who was getting a loan by the sale of his own note, as the maker was but his surety, and the note has no more vitality than one in the hands of an agent of its maker. Of course, too, it would equally follow that the payee would be obliged to pay in full, as the maker on being compelled to pay would be allowed to recover from his principal. The New York and other cases which allow the purchaser of a note from an endorser to recover the face of the note

from the maker, but only the amount paid from the endorser, being cases in which the endorser is holder for value or owner. Mr. Justice Strong says: "In Gaul v. Willis, 2 Casey [26 Pa. St.] 259, a suit indeed by the second endorsee against the maker, the holder was allowed to recover against the maker of an accommodation note the entire amount according to its tenor, though the discount at each negotiation had exceeded six per cent. He was regarded as not the less a bona fide holder for value, because he purchased for less than upon the face of the note appeared to be due. What has the maker to do with that? He has lent his credit for the sum named in the note. Shall one who received it as collateral, and is not therefore a holder for value at all, be permitted to recover, and a recovery be denied to him who is a holder for value, but happens to have purchased for less than the face of the paper? Such is not the law. In the present case the plaintiff below was not only a holder for value, but he purchased it without knowledge that it was an accommodation note. The defendant had, therefore, according to his own showing, no defence, and the judgment of the court below is right."

From these cases of Musgrove v. Gibbs, Creed v. Stevens, Gaul v. Willis, and Moore v. Baird, it will be seen that the intention and knowledge of the parties were not ignored even under the act of 1723, but the language of the act of 28th May, 1858, is materially different. It is "when a rate of interest for the loan or use of money exceeding that established by law shall have been reserved or contracted for," that its provisions as to the usurious excess apply, and in Fitzsimmons v. Baum, 8 Wright [44 Pa. St.] 32, the same learned judge who delivered the opinion in Craig v. Pleiss, ut supra, says: "I agree with the learned counsel, that the excessive interest must be 'reserved or contracted for' by the parties. These are the very words of the statute." And the ruling of the court below was sustained in leaving it as a question of fact for the jury to find whether the transaction in question was, in fact, a sale or a loan at usurious rates under the guise of a sale. The decisions are therefore now applicable, which hold that to constitute usury "there must be a loan" (Nichols v. Fearson, 7 Pet. [32 U. S.] 103–109), and the ground and foundation of all usurious contracts is the corrupt agreement (Murray v. Harding, 2 W. Bl. 859). Where there has been no loan and no contract for a loan, there can be no usury in the very nature of things. It is true, that if the bargain is in effect a loan, the avowed intention of the parties is of no consequence; but there must be in fact a contract for the use of money, or there can be no interest. So where the transaction is in fact a loan on a conveyance for its security, no contemporaneous agreement can

clog the equity of redemption, or make it anything else but a mortgage; but where it can be established that there was no debt, and the transfer of title was not in reality a security for its repayment, a conditional sale may be made, even in Pennsylvania. Spering's Appeal, 10 P. F. Smith [60 Pa. St.] 199; Haines v. Thomson, 11 Am. Law Reg. (N. S.) 680.

Now in the present case the only evidence that the defendant bought the note from the brokers of the bankrupt is contained in the admission that "he purchased the note of Messrs. C. & H. Borie, in the regular course of business, without knowledge of, or communication with, Mr. Yerkes." It is true that he knew they were brokers, but there was no presumption as a matter of law that they were the brokers for the bankrupt. And if he was to be affected with notice, the burden was on the plaintiff to bring it home to him. And if it were the duty of the defendant to make inquiry, what would be the consequence of the broker's making a false representation? In New York a certificate annexed to a note is held to estop the maker from setting up the plea of usury, (Clark v. Loomis, 5 Duer, 468; Bossange v. Ross, 29 Barb. 576), but there is no decision, so far as known, which authorizes the purchaser of a security to rely upon the representation of the seller as a protection against the defence of usury, and if he could not protect himself by the answer, it cannot be his duty to ask the question; while to require the business community to obtain briefs of title to the bills and notes bought in the open market, and to take the risks of misrepresentation by the brokers selling them, would be to destroy the chief value of negotiable paper by impairing its negotiability. Such a note so endorsed in blank, passes from hand to hand by delivery, like coupon bonds or bank notes. With approved collaterals attached, they are always marketable, and never lack for a purchaser, and to facilitate their currency or freedom of transfer is a well recognized policy of the law. Hence, Prof. Parsons, while approving of the New York and Massachusetts decisions before cited, makes the following observations in reference to such a case as the present: "It is admitted that if one knowingly buys a note of the maker, or a bond through the agent of the maker for less than its face, this is a loan to him, and a usurious one. If, for example, a railroad company, makes its bonds payable at a distant period, with interest coupons attached, and sells them by its officers, or a broker or other agent, for less than their face, this must be usury. But does it affect as usury one who purchases them in ignorance of the circumstances? The question we would ask is this—If one purchases such bonds for less than their face, not from the railroad, but from one whom he verily be-

lieves to own them, for value, or if one purchases them without any knowledge or opinion on the subject, but in fact from one not the railroad, can the defence of usury be made against those bonds in his hands, on the ground that the railroad was actually the seller, and the purchaser the first holder? It may not be certain how the courts would answer this question, but we think the authorities favor the conclusions to which we should be led by what seems to us the reasons of the case. They are, that one who purchased for value, in good faith, and in the belief that he did not buy from the railroad, but from some subsequent holder, certainly was not open to the defence of usury. And we go farther, although with less confidence, and say, that the usurious intent must be proved by the party who would profit by it, and therefore if the maker of such bonds or notes would defend against them, in whole or in part, on the ground that they constituted a usurious contract between the plaintiff and himself, he must bring home to the plaintiff the knowledge that the plaintiff bought them of the defendant, in fact though indirectly or at the very farthest, such means of knowledge or reasons for belief as would make his ignorance his own fault."

As to the suggestion of the learned author that means of knowledge may be equivalent to actual knowledge, reference may be made to the late cases of Phelan v. Moss, 17 P. F. Smith [67 Pa. St.] 62; State Bank v. McCoy, 19 P. F. Smith [69 Pa. St. 204], and Bush v. Crawford [Case No. 2,224],—which decided that the holder of a negotiable note bona fide for value, without notice, can recover it, notwithstanding that he took it under circumstances which ought to excite the suspicion of a prudent man, and that nothing but mala fides or actual knowledge can defeat his recovery. So, too, in Mechanics' Bank v. Foster, 44 Barb. 87, it was held: "The sale of a note by a person not the maker for a sum less than its face is not necessarily a usurious transaction, nor is the burden thrown upon the purchaser of inquiring into the character of the note." In Virginia the precise question has been decided in favor of the purchaser. In the case of Whitworth v. Adams, 5 Rand. (Va.) 333, it was ruled (as in Moore v. Baird) that the purchase of an accommodation note from the broker of the payee at a greater discount than the legal rate of interest was not usurious. The remarks of Cabell, J., are pertinent in this connection. "By the law merchant, which has by adoption become a part of the common law of the land, every bill of exchange imports, as before said, a full and fair consideration, and if it was originally made payable to bearer, or has become so payable by having been endorsed in blank, every bearer or holder, be he agent, trustee,

finder or thief, has a right to sell it, and to transfer it by delivery. In no case whatever is the person disposed to purchase it bound by the law to make any inquiries as to the right by which the bearer or holder sells it, nor after he has purchased it, can his right to demand and receive its amount from all the parties to it be objected to on the ground that the person who sold it exceeded his authority, violated his trust, or that having only found or stolen the bill, he had no title to it. To compel the purchaser to go into inquiries as to the consideration, or to permit the parties to the bill to object to its payment, on any of the grounds stated, would greatly impair the negotiability of bills and notes; their most distinguishing, most useful and most valued feature. Surely, therefore, a person purchasing such a bill from the holder or bearer, must regard him as the owner, and deal with him as the owner, even if he be a broker; unless indeed he had actual notice of the real owner. And if the purchase of an accommodation bill or note be made in ignorance of the character of the note, and of the person who is the real owner, and be made at a discount greater than legal interest, on what principle can it be said to be a loan, express or implied; without which we have already seen there can be no usury? If it be a loan, there must be a borrower as well as a lender. To whom was the loan made; who was the borrower in this case? Every loan implies, necessarily, an obligation on the borrower to return the money received. But it must be confessed that in this case the transaction imposed no obligation on Belcher, the broker, to return the money he received, nor to be liable for it, in any event, or in any manner whatever. Nor did any of the parties intend that he should be liable. The parties could not, therefore, have intended a loan and borrowing so far as respects the broker. But it is contended that it was a loan to Wilson & Orr. In the case of Floyer v. Edwards, Cowp. 114, Lord Mansfield said, 'that the view of the parties must be ascertained in order to satisfy the court that there was a loan and borrowing.' But how is 'the view of the parties' to be ascertained? From the facts of the transaction, as they were exhibited, and appeared to the parties at the time. It is on this principle that the purchaser of an accommodation bill or note, at a discount greater than legal interest, from the known agent of the party for whose accommodation it was made, is held to be usurious. In such a case, the facts of the transaction as they appear to the purchaser, make known to him that he is advancing his money to the very man whose bill or note he gets, and that the bill or note had no legal obligation whatever, until he received it. The substance and nature of such a transaction is nothing

more than a loan at more than legal interest, and the bill or note a security for it, and that was the real intention of the parties. If the facts of the transaction, as they appeared to the parties at the time, are to be examined for ascertaining 'the view of the parties' in order to satisfy the court that the transaction was, in its 'nature and substance,' different from the form which they have given to it, surely the same examination should be made for ascertaining 'the view of the parties,' in order to satisfy the court that the transaction was, in its 'nature and substance,' that which its form indicates. Applying this test to this transaction, the question as to a loan to Wilson & Orr is at an end. Johnson saw a note importing full consideration and payable to bearer in the hands of Belcher, a broker. He knew that Belcher, as holder or bearer, had the right to sell it, and to transfer it by delivery, and that any person had the right to purchase it from him as holder at any price that might be agreed upon, provided Belcher did not make himself liable to return a greater sum than the sum received, and legal interest. Wilson & Orr appeared not in the transaction; Johnson knew not that they had any interest in it. How, under such circumstances, is it possible that Johnson, in exercising an acknowledged right to purchase the note which Belcher had an acknowledged right to sell, intended to lend to Wilson & Orr the money which he paid to Belcher as the price of the note? If the circumstances of a transaction may be resorted to for ascertaining the 'view of the parties' (and it is certainly a most legitimate source), Johnson intended not to lend his money, but to buy a note. And therefore the transaction is untainted with usury; for, as has been said before, there can be no usury where there is no loan."

Following this authority, it was held in Brummel v. Enders, 18 Grat. 873, that "where the maker of a note names no payee, and places it, in that condition, in the hands of an agent for negotiation, who sells it at a greater discount than the legal rate of interest to a purchaser who does not know that the note is sold for the maker's benefit, and the name of the purchaser is inserted in the note when it is delivered to him by the agent, or subsequently, the transaction is not usurious." In Illinois, also, it has been decided that where a note was drawn to the order of bill brokers employed to raise money for the maker, a sale at any price was not usurious. Sherman v. Blackman, 24 Ill. 345. In Massachusetts a different conclusion was reached in Sylvester v. Swan, 5 Allen, 134; but in that state a bona fide purchaser from a payee of an accommodation note will not take a good title. Whitten v. Hayden, 7 Allen, 407. No reference was made to any other authorities bearing directly upon the point, but in none of the other states are the provisions of the statute of usury so favorable to the purchaser of negotiable securities as in Pennsylvania.

The acts of 1842 and 1856, (Purd. Dig. 561, pl. 4, 5) authorize railroad and canal companies to sell their bonds under par, and the proviso, already quoted, of the second section of act of 28th May, 1858, expressly excepts from the operation of the statute "the holders of negotiable paper taken bona fide in the usual course of business." Without such proviso the new statute would not have affected one purchasing negotiable paper from a holder for value—it has never been thought that the holder of a bond or other security than bills or notes could not sell it just as freely since 1858 as before. Applying then the familiar maxim that force must be given to every word of the law, no meaning has been ascribed to the language of the proviso, unless it be to protect such transactions as in Gaul v. Willis, Moore v. Baird, and the present case. It is admitted by the plaintiffs that as a conclusion of fact the defendant purchased the note in good faith, in the usual course of business, and the only contention is, that in law, upon the facts of the case, he could not have been such a purchaser, but if the very words of the statute exempt him from its provisions, there is no room left for construction. And this is an answer to the suggestion that the decisions of other states should be followed in a federal court, rather than those of Pennsylvania. It is true that in questions of a commercial and general nature, the federal courts are not bound by the decisions of the state courts (Williams v. Insurance Co., 13 Pet. [38 U. S.] 415), but they follow the decisions of the state tribunals on all questions depending on the local statute laws of the states. Suydam v. Williamson, 24 How. [65 U. S.] 427; Leffingwell v. Warren, 2 Black. [67 U. S.] 599.

Whether this contract of purchase was lawful or not, depends on the language of the Pennsylvania statute, and is a question of Pennsylvania law. So regarding it, and putting an interpretation upon the language of the act of assembly of 1858 in the light of the Pennsylvania decisions to which reference has been made, it is believed that the defendant must be held "a holder of negotiable paper, taken bona fide in the usual course of business," and that therefore judgment should be entered in his favor.

The case was taken to the circuit court of the United States by writ of error.

Geo. Junkin, Esq., for plaintiffs in error, among other authorities, cited and relied on Sylvester v. Swan, 5 Allen, 134 (Bigelow, C. J.), and Campbell v. Nichols, 4 Vroom (33 N. J. Law) 81 (Beasley, C. J.).

Jas. W. Paul, Esq., for defendant in error

Before McKENNAN, Circuit Judge.

The judgment of the district court was affirmed. No written opinion was delivered.